UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RITA CLINTON,

    *Plaintiff*,

v.

DAN BROUILLETTE, in his official capacity as Secretary of the United States Department of Energy,

    *Defendant.*

No. 19-cv-01674 (DLF)

## MEMORANDUM OPINION

Rita Clinton brings this action against Dan Brouillette in his official capacity as the Secretary of the United States Department of Energy ("the Department").[1] She alleges that while working for the Department she was subjected to a hostile work environment in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Title VII). Before the Court is the Department's Motion to Dismiss or, in the Alternative, for Summary Judgment.[2] Dkt. 9. For the reasons that follow, the Court will grant the motion.

---

[1] When this suit began, Rick Perry was the Secretary of the Department of Energy. When Dan Brouillette became the Secretary, he was automatically substituted as the proper defendant. *See* Fed. R. Civ. P. 25(d).

[2] Also before the Court is Clinton's Motion for Leave to File Surreply, Dkt. 15, to respond to the facts and exhibits attached to the Department's reply, *see id.* at 2–3; *see also* Def's Resp. to Pl.'s Statement of Material Facts in Dispute, Dkt. 14-1; Def.'s Ex. A, Dkt. 14-2; Def.'s Ex. B, Dkt. 14-3. Because the Court will not consider those materials in ruling on the Department's motion, the Court will deny the plaintiff's request to file a surreply.

I.     BACKGROUND

    A.     **Factual Background**

From June 2010 to July 20, 2017, the Department of Energy employed Clinton in a Senior Executive Service position in the Department's Office of the Chief Human Capital Officer.[3]  *See* Compl. ¶ 16, Dkt. 1; Def.'s Statement of Material Facts As to Which There is No Genuine Material Dispute ("Def.'s Statement of Facts") ¶ 1, Dkt. 9-1.  Specifically, Clinton was the Director of Human Capital Policy and Accountability, and was responsible for "managing operations, influencing DOE-wide policy and planning related decisions, and exercising full managerial authority and aggressive integration of all human capital policies."  *Id.* ¶¶ 1–2.  Clinton's immediate supervisor was Tonya Mackey, the Deputy Chief Human Capital Officer.  *Id.* ¶ 3.

In November 2016, Mackey was informed by both her staff and staff in the Department's Office of Environment, Health, Safety, and Security that 87 suitability determination cases had been emailed to Clinton but had not been adjudicated.  *Id.* ¶ 14.  This led Mackey to meet with Clinton and ask her about this backlog, *see id.* ¶ 15, though the parties dispute whether Clinton denied receiving the emails in question, *compare id.*, *with* Pl.'s Response to Def.'s Statement of Undisputed Material Facts ("Pl.'s Statement of Facts") ¶ 15, Dkt. 12-1.  Mackey chose to further investigate the issue and requested a search of Clinton's email account, which the Department's Office of the General Counsel approved due to evidence of potential misconduct.  *See* Def.'s Statement of Facts ¶¶ 16–18.

---

[3] The Court cites to the defendant's statement of facts if a fact is undisputed.  If a fact is disputed, the Court will indicate as such.

Meanwhile, Clinton expressed interest in being detailed to another office within the Department of Energy. *See id.* ¶ 4. In December 2016, Clinton requested a detail to the Bonneville Power Administration as Human Resources Director, but Mackey told Clinton that her current role was an essential one, which meant a candidate was needed for Clinton's current position before Clinton could be detailed. *Id.* Mackey instructed Clinton to draft an expression of interest announcement for a detail to Clinton's current position that could be shared with potential candidates. *Id.* ¶ 8. Mackey also directed Clinton to simultaneously draft an expression of interest announcement for a vacant position within Clinton's office. *Id.* ¶ 10. The parties dispute whether individuals in Senior Executive Service positions are typically involved in preparing expression of interest announcements. *Compare id.* ¶ 9, *with* Pl.'s Statement of Facts ¶ 9. Regardless, Clinton submitted a draft announcement for her position on January 4, 2017, Def.'s Statement of Facts ¶ 11, and for the vacant position on January 17, 2017, *id.* ¶ 12. Mackey edited the drafts and returned both to Clinton on January 24, 2017, and the announcements were circulated on January 26, 2017 and January 31, 2017. *See id.* ¶¶ 11–13.

On January 23, 2017, "a government-wide hiring freeze" was issued which mandated that "no vacant position could be filled or created." *Id.* ¶ 5. Positions were not considered vacant if a candidate for that position "had received an offer of employment prior to noon on January 27, 2017, had accepted the position, and had a designated start date on or before February 22, 2017." *Id.* The parties dispute whether Clinton's detail request could have been acted upon notwithstanding the freeze, *compare id.* ¶¶ 5–7, *with* Pl.'s Statement of Facts ¶¶ 5–7, but they do not dispute that Clinton's detail request was delayed, *see* Def.'s Statement of Facts ¶ 7; Pl.'s Statement of Facts ¶ 7.

3

Soon there were several developments within the office that troubled Clinton.  One of Clinton's employees had been detailed to another office shortly before the hiring freeze went into effect, Def.'s Statement of Facts ¶¶ 19–20, and Clinton believed the loss of this staffer would make it more difficult for her to fulfill her responsibilities, *see* Compl. ¶ 33.  Mackey also questioned Clinton about a recent policy change to the Department's ePerformance system, though the parties dispute whether Mackey inaccurately accused Clinton of implementing this policy and making errors with respect to that implementation.  *Compare* Def.'s Statement of Facts ¶¶ 22–23, *with* Pl.'s Statement of Facts. ¶¶ 22–23.

Clinton also expressed frustration with one of her employees participating in a call with the Office of Personnel Management at the behest of a senior leader within the Office of the Chief Human Capital Officer.  *See* Def.'s Statement of Facts ¶ 31; Pl.'s Statement of Facts. ¶ 31.  Mackey met with both Clinton and Clinton's employees to discuss the issue.  Def.'s Statement of Facts ¶ 31.  In that meeting, Mackey stressed the importance of open communication but instructed Clinton that "leadership should be able to go to subordinate employees if they need assistance."  *Id.* ¶ 32.

There were also problems with Clinton's performance plan for FY2017.  The parties dispute whether Clinton or Mackey was responsible for developing Clinton's performance plan.  *Compare* Def.'s Statement of Facts ¶ 27, *with* Pl.'s Statement of Facts ¶ 27.  But they do not dispute that on March 20, 2017, Mackey asked Clinton to send her Clinton's draft performance plan, that Clinton did so, and that Mackey returned the plan to Clinton with edits.  Def.'s Statement of Facts ¶¶ 28–29.  Mackey also asked Clinton to input the plan into the Department's electronic performance management system, but Clinton did not do so.  *Id.* ¶ 30.

4

On April 20, 2017, Clinton received a Notice of Proposed Removal based on a lack of candor charge that stemmed from the investigation into the suitability determination backlog. *See id.* ¶¶ 24, 38–39. Clinton was escorted out of the office by security at noon that day. *Id.* The parties dispute whether the Department has a regular practice of escorting employees out of the office following the issuance of a Notice of Proposed Removal. *Compare id.* ¶ 26, *with* Pl.'s Statement of Facts ¶¶ 25–26.

Clinton's removal from federal service became effective on July 20, 2017. Def.'s Statement of Facts ¶ 43. On July 26, 2017 she submitted an affidavit to the District of Columbia's Department of Employment Services in support of her claim for unemployment benefits. *See id.* ¶ 33. Her affidavit indicated that the reason she had been removed from her position at the Department of Energy was "misconduct – 'lack of candor,'" *id.* ¶ 34, and Clinton's unemployment claim was eventually denied as a result, *see id.* ¶ 36.

Prior to being issued her Notice of Proposed Removal, Clinton had contacted an Equal Employment Opportunity (EEO) counselor, and on April 17, 2017, she filed a formal EEO complaint alleging unlawful discrimination and harassment in retaliation for prior EEO activity, and on the basis of her age, race, and sex. *See id.* ¶¶ 47–48. After completing an investigation into Clinton's claims, the Department of Energy issued a final decision on March 12, 2019 concluding that Clinton was not entitled to any relief because the record did not "show by a preponderance of the evidence that [Clinton] was subjected to discrimination and/or harassment based on age, race, and/or sex or that she was subjected to retaliation based on her prior EEO activity."[4] *Id.* ¶ 54.

---

[4] Clinton amended her EEO complaint to include her removal from federal service, but that issue was dismissed from Clinton's EEO complaint on May 16, 2018, Def.'s Statement of Facts ¶ 52,

5

### B. Procedural History

Clinton filed this action on June 7, 2019. *See* Compl. In her complaint, Clinton asserts three hostile work environment claims under Title VII, alleging that she was subjected to a hostile work environment on the basis of her sex, her race, and as retaliation for prior EEO activity. *See id.* at 7–10. On December 12, 2019, the Department filed this motion to dismiss or, in the alternative, for summary judgment. *See* Dkt. 9.

## II. LEGAL STANDARDS

Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) …, matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Here, both parties have submitted materials outside of the pleadings. *See, e.g.*, Pl's Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 1–3, 4, 7–8, Dkt. 12 (stating that the Department's motion should be treated as one for summary judgment and referencing materials outside the pleadings); Pl.'s Mot. for Leave to File Surreply at 4–5 (contending "[i]t is axiomatic" that the Department's motion should be treated as one for summary judgment). "Accordingly, the Court will review Defendant's entire motion under the summary judgment standard, because 'the defendant's motion was in the alternative for summary judgment and … the parties had the opportunity to submit and submitted materials in support and in opposition.'" *Conant v. Wells Fargo Bank, N.A.*, 24 F. Supp. 3d 1, 11 (D.D.C. 2014) (quoting *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1273 n.5 (D.C. Cir. 1997) (alterations omitted)).

---

and is the basis of a separate action, *see Clinton v. Perry*, No. 18-cv-991 (D.D.C. filed Apr. 26, 2018). As a result, Clinton's ultimate removal from federal service is not relevant to the claims here.

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *See id.* at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**III.   ANALYSIS**

To establish a discriminatory or retaliatory hostile work environment claim, Clinton must show that the Department subjected her "to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79, 82–83 (D.D.C. 2013) (collecting cases establishing that "the same legal standard" applies to discriminatory and retaliatory hostile work environment claims).

7

In assessing a hostile work environment claim, courts examine "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Title VII is not a "general civility code"; the conduct "must be extreme [enough] to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted); *see also Baloch*, 550 F.3d at 1201. The conditions must be both "objectively and subjectively hostile, meaning that a reasonable person would find [the work environment] hostile or abusive, and that the victim must subjectively perceive the environment to be abusive." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (internal quotation marks omitted).

Clinton bases her hostile work environment claims on the following incidents, all of which took place over a few months: (1) "the delay and denial of a detail [o]pportunity"; (2) "an investigation of [Clinton's] email account without [her] knowledge"; (3) her "staff employee being detailed away to a different office . . . without [Clinton]'s consent"; (4) Mackey's "baseless allegations" that Clinton had made mistakes in implementing a policy change regarding the Department's ePerformance system; (5) her escort out of the office "in the middle of the day, after receiving a notice of proposed removal"; (6) Mackey requiring Clinton "to prepare an expression of interest announcement for her detail"; (7) the Department's "failure to provide [Clinton] with performance standards and a performance plan for FY2017"; (8) the March 2017 meeting in which Mackey "undermin[ed] [Clinton]'s ability to manage her employees"; and (9) the Department "preventing [Clinton]'s unemployment claim from being processed." *See* Pl.'s Opp'n at 2.

8

Far from "the kind of 'extreme' conditions that this Court and the Supreme Court have found to constitute a hostile work environment," *Hill*, 897 F.3d at 237, most of Clinton's complaints—including those about the delay and denial of her detail, her employee being detailed elsewhere, being asked to prepare an announcement for her own detail, and feeling undermined by supervisors during a meeting in front of her employees—are "ordinary tribulations of the workplace." *See Faragher*, 524 U.S. at 788 (internal quotation marks omitted); *see also Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 81 (D.D.C. 2007) (denials of "requests for additional resources despite an increased workload" were insufficient for hostile work environment claim); *Veitch v. England*, 471 F.3d 124, 130–31 (D.C. Cir. 2006) (failure to promote, the assignment of unappealing duties, and criticisms by supervisor were insufficient for hostile work environment claim). Clinton insists that her supervisors scrutinized her work "excessive[ly]" and made "baseless" criticisms about it. Pl.'s Opp'n at 2, 19. For example, Clinton claims she was questioned about a policy change to the Department's ePerformance system "in a manner which indicated . . . that Clinton had implemented the change and indicated that Clinton had made an error." *Id.* at 12. But the Department denies accusing Clinton of implementing these changes and says she was "simply asked . . . for more information" about them. *See* Def.'s Mem. in Supp. of Mot. to Dismiss or, in the Alternative, for Summ. J. at 15, Dkt. 9. Even crediting Clinton's account of the events, as the Court must, this conduct was not sufficiently severe or pervasive to give rise to support a hostile work environment claim. Nor has Clinton shown that the Department's investigation was tied to any discriminatory or retaliatory act.[5]

---

[5] Clinton has introduced evidence that the Department was aware of her race, sex, and prior EEO activity, *see, e.g.*, Pl.'s Opp'n at 11–12, 27, but that awareness, without more, does not transform

9

Clinton relies heavily on *Coulibaly v. Kerry* to support her hostile work environment claim, but in that case an employee presented substantiated evidence of constant questioning and criticism from supervisors for over a year. 213 F. Supp. 3d 93, 148–50 (D.D.C. 2016). Here, Clinton has not adequately substantiated her claim that it was improper for the Department to investigate an allegation of potential misconduct. *See* Def.'s Ex. 10 at 3, Dkt. 9-11. *Román v. Castro*, 149 F. Supp. 3d 157, 169 (D.D.C. 2016) ("Legitimately investigating an employee for suspected misconduct is generally not grounds for a hostile work environment claim."). And Clinton's comparison of her work environment at the Department to that in *Ashraf-Hassan v. Embassy of France in United States* is also inapt. *See* 999 F. Supp. 2d 106 (D.D.C. 2013). There, the plaintiff's supervisors referred to the plaintiff by a racial epithet, required her to fulfill other employees' responsibilities, did not permit her to participate in organizational events, and took away her access to an office and email account. *See id.* at 113–15 .

Clinton further contends that she was "singled out" by Mackey's requirement that Clinton generate the initial draft of her own performance plan and standards for FY2017. According to Clinton, the Department's policies required supervisors "to develop performance plans *in consultation with senior executives*" like Clinton. Pl.'s Opp'n at 16–17 (emphasis in original). It

---

the Department's actions into the type of discriminatory intimidation, ridicule, or insult "that a reasonable person would find hostile or abusive," *see Harris*, 510 U.S. at 21; *see also Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) ("[M]any bosses are harsh, unjust, and rude, it is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.") (internal quotation marks omitted). While Clinton emphasizes that the Department's Deputy EEO Director told her that one of her supervisors was "very upset" that she had filed her April 2017 EEO complaint, *see* Pl.'s Ex. K at 6, Dkt. 13-27; Pl.'s Opp'n at 27, those comments were made after all but two of the incidents about which Clinton complains, *see* Pl.'s Facts ¶¶ 12–15, 19, 21–22, 28–29, 31–32, and for the reasons stated here, neither of those two incidents, alone or together, are sufficient to state a hostile work environment claim.

is not at all apparent that "in consultation with senior executives" *required* Clinton's supervisors to prepare the first draft of her performance plan, *see* Def.'s Statement of Facts ¶ 27; Pl.'s Statement of Facts ¶ 27.  But even if it did, asking Clinton to generate a first draft of her own performance plan for her supervisor to review, edit, and approve, does not rise to the level of "severe and pervasive" conduct necessary to support a hostile work environment claim.  *See Baloch*, 550 F.3d at 1201 (internal quotation marks omitted).

Clinton expresses frustration about being escorted out of the office after receiving her Notice of Proposed Removal "at noon, rather than at the end of the day," because an escort at the end of the day would have been less embarrassing and in accordance with the Department's regular practice.  *See* Pl.'s Opp'n at 30–31.  But again, even if true, the embarrassment attendant upon her escort out of the workplace falls short of the "discriminatory intimidation, ridicule, and insult" necessary to give rise to a hostile work environment claim.  *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted).

Finally, Clinton laments that she could not receive unemployment benefits as a result of the Department leveling a lack of candor charge against her, *see* Pl.'s Statement of Facts at ¶ 39, but this denial of unemployment benefits occurred after she was no longer employed at the Department of Energy, *see* Def.'s Statement of Facts ¶¶ 37–42.  Consequently, the denial of her claim could not possibly "alter the conditions of [Clinton]'s employment."  *Baloch*, 550 F.3d at 1201 (internal quotation marks omitted).

Considering the totality of the circumstances—and viewing the evidence in the light most favorable to Clinton—as the Court must, a reasonable jury could not find that the Department acted with discriminatory intent, *see Lester v. Natsios*, 290 F. Supp. 2d 11, 31–32 (D.D.C. 2003), or that it subjected Clinton "to discriminatory intimidation, ridicule, and insult that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Baloch*, 550 F.3d at 1201 (quotations and citation omitted). This conclusion is consistent with D.C. Circuit cases involving more challenging workplace conditions. *See, e.g*, *id.* at 1195, 1201 (affirming grant of summary judgment to the defendant where hostile work environment claim was based on allegations of poor performance reviews, several letters of counseling and reprimand, leave restrictions, two proposed suspensions, and several verbal altercations, including one in which a supervisor threatened to have the plaintiff "arrested, led out of the building in handcuffs, and jailed"); *George v. Leavitt*, 407 F.3d 405, 408–09, 416–17 (D.C. Cir. 2005) (affirming grant of summary judgment to defendant where claim was based on, among other things, "several confrontations" in which different employees told the female black plaintiff to "go back to where she came from," the plaintiff was "assigned to various clerical duties that the white male engineers were never required to do," and the plaintiff's supervisor recommended that she be fired (alteration adopted)); *see also Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 93–94 (D.D.C. 2009) (plaintiff failed to state a claim for relief where his claim was based on allegations that management "passed over [the plaintiff] for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks about his EEO complaints, closely scrutinized his work, . . . and engaged in a series of discussions to end his eligibility for workers' compensation and to terminate his employment at NASA, before finally firing him" (internal quotation marks omitted)). Accordingly, Clinton's hostile work environment claims fail as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court grants the defendant's motion for summary judgment. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

August 18, 2020